IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


REBECCA L. RADCLIFF,         )     CASE NO. 5:18-cv-00777
                                   )
             Plaintiff,      )
                                   )
         v.              )     MAGISTRATE JUDGE
                                   )     KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL       )
SECURITY ADMINISTRATION,    )
                                   )     **MEMORANDUM OPINION & ORDER**
          Defendant.    )

Plaintiff Rebecca L. Radcliff ("Plaintiff" or "Radcliff") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before

the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 19.   As explained

more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Radcliff filed an application for DIB in 2015, alleging disability beginning March 6,

2012.[1]  Tr. 40, 145, 217-218.   At the hearing Radcliff amended her alleged onset date to May 1,

2014.  Tr. 96-97, 239.  Radcliff alleged disability due to bipolar disorder, depressive disorder,

migraines, anxiety, arthritis, fibromyositis, gastroesophageal reflux disease, onychomycosis,

gastroparesis syndrome, and knee pain.  Tr. 132, 146, 162, 167, 244.  After initial denial by the

---

[1] While not specifically mentioned in either party's brief, the June 21, 2017, ALJ decision indicates that Radcliff
also filed an application for SSI benefits in 2017, alleging disability as of March 6, 2012.  Tr. 40, 58, 92.

state agency (Tr. 162-164) and denial upon reconsideration (Tr. 167-169), Radcliff requested a hearing (Tr. 170-171). On May 17, 2017, (Tr. 90-130), an Administrative Law Judge ("ALJ") conducted an administrative hearing.

On June 21, 2017, the ALJ issued an unfavorable decision (Tr. 37-63), finding that Radcliff had not been under a disability within the meaning of the Social Security Act from May 1, 2014, through the date of the decision (Tr. 41, 58). Radcliff requested review of the ALJ's decision by the Appeals Council. Tr. 213-216. On February 8, 2018, the Appeals Council denied Radcliff's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-7.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Radcliff was born in 1972. Tr. 57, 99, 131, 217. At the time of the hearing, Radcliff lived with her two sons, ages 16 and 17. Tr. 99-100. She graduated from high school. Tr. 101. While in high school, Radcliff attended vocational classes and received a certificate for executive secretary. Tr. 101, 245. Post-high school, Radcliff attempted online schooling but did not finish. Tr. 101. She only took the online classes for one or two months. Tr. 101. Radcliff's most recent work ended in May 2014. Tr. 102-103. She was working as a self-employed babysitter. Tr. 102. She cared for no more than two children at a time for about four to six hours each day, four or five days per week. Tr. 102-103. She worked as a babysitter from 2010 until 2014. Tr. 103. Prior to working as a babysitter, Radcliff worked at a convenience store for about nine or ten months. Tr. 104. She worked as a cashier, stocked shelves, filled coolers, and prepared some different types of food. Tr. 104-105.

**B.     Medical evidence**

**1.     Treatment records**

On May 1, 2014, Radcliff saw her primary care physician Gertrude Cotiaux, M.D., with complaints of numbness and tingling bilaterally in her hands and feet.  Tr. 420-424.  Radcliff also reported problems staying asleep, muscle aches all over, arthralgias/joint pain, low back pain, neck pain, irritability, depression (better), and anxiety (very stressed).  Tr. 422-423.  On physical examination, Dr. Cotiaux observed that Radcliff was ambulating normally; she had normal tone and motor strength; she had normal movement of all extremities but tenderness (on 18/18 trigger points, with low back pain, normal gait); she had no edema; and pulses were 2+ and equal bilaterally.  Tr. 423.  Dr. Cotiaux's assessment was anxiety; depressive disorder; fibromyositis; arthritis; migraine; and nicotine dependence.  Tr. 424.  Dr. Cotiaux prescribed alprazolam (0.5 mg twice per day) for Radcliff's anxiety and gabapentin (300 mg once per day) for her fibromyositis.  Tr. 424.

During a September 23, 2014, visit with Dr. Cotiaux, Radcliff reported that the gabapentin helped some with her fibromyalgia but it made her very drowsy the next day.  Tr. 406.  Radcliff also reported having problems staying asleep but she reported no irritability, depression, anxiety, panic attacks or paranoia.  Tr. 406.  Dr. Cotiaux continued Radcliff on gabapentin but at a reduced dose (100 mg once per day).  Tr. 407.

On May 22, 2015, Radcliff saw Dr. Cotiaux with complaints of lower extremity swelling.  Tr. 526, 529.  During a June 5, 2015, follow-up visit, Radcliff reported ankle edema; muscle aches and swelling in her extremities; irritability; depression; and anxiety.  Tr. 525.  Radcliff indicated that the gabapentin was not helping much with her muscle aches.  Tr. 525.  The

swelling in Radcliff's legs was better.  Tr. 525.  On physical examination, Dr. Cotiaux observed

that Radcliff ambulated normally; she had normal tone and motor strength and normal movement

in all extremities; there was a trace amount of edema in the extremities; and pulses were 2+ and

equal bilaterally.  Tr. 525.  Dr. Cotiaux continued Radcliff on alprazolam for her anxiety and

prescribed Lyrica (75 mg twice each day) for Radcliff's fibromyositis.  Tr. 526.

On August 17, 2015, Radcliff saw Arsal Ahmad, M.D., of Ohio Pain and Rehab

Specialists for her diffuse pain.  Tr. 505-509.  Radcliff explained that her pain started several

years prior and she was unaware of a specific triggering event that started the problem.  Tr. 505.

She described her pain as constant, aching and throbbing.  Tr. 505.   On a scale of 0 to 10,

Radcliff rated her pain as a 7.5.  Tr. 505.  She indicated that her pain had been so intense that her

daily activities were significantly impacted.  Tr. 505.  Radcliff's pain was improved with

medication.  Tr. 505.  She indicated that she had some relief with Flexeril, which she took at

night.  Tr. 505.  Radcliff relayed that she had tried ice and heat without much benefit.  Tr. 505.

Her pain worsened with bending.  Tr. 505.  Radcliff denied numbness, tingling, balance

problems and spasms.  Tr. 506.  She admitted joint pain and swelling, limitation of motion, pain,

and stiffness but denied global weakness or myalgia, focal weakness, neck pain and back pain.

Tr. 506.  There was no report of anxiety or depression.  Tr. 506.  On physical examination, Dr.

Ahmad observed pain in at least 11 of 18 tender points.  Tr. 507.   Dr. Ahmad concluded that

Radcliff's history and examination were consistent with fibromyalgia.  Tr. 508.  Dr. Ahmad

discussed fibromyalgia mechanisms and associated symptoms and reviewed treatment strategies

and goals.  Tr. 508.  Dr. Ahmad also ordered bloodwork and an EMG of the bilateral lower

extremities.  Tr. 508.  Dr. Ahmad added Tramadol (50 mg) for pain.  Tr. 508.  The EMG

performed on September 1, 2015, was normal.  Tr. 553-556.

During a September 25, 2015, follow-up visit with Dr. Cotiaux (Tr. 518-522), Radcliff reported fatigue (daytime sleepiness), insomnia (problems staying asleep), increased snoring, ankle edema bilaterally, excessive dry and itchy feet, irritability, depression, anxiety and panic attacks (Tr. 520). During the visit, Dr. Cotiaux observed that Radcliff ambulated normally. Tr. 520. Dr. Cotiaux observed mild ankle edema. Tr. 521. Radcliff was advised to continue with her chronic medications. Tr. 522.

On September 30, 2015, Radcliff saw Dr. Ahmad for follow up. Tr. 547-551. Radcliff rated her pain a 4 on a scale of 0 to 10. Tr. 547. Radcliff reported some relief with Flexeril but the Tramadol was not helpful and, due to swelling, she was unable to tolerate gabapentin or Lyrica. Tr. 547. Radcliff's pain was worse with bending, walking and colder weather. Tr. 547. Radcliff also reported associated numbness, tingling and skin sensitivity. Tr. 547. Dr. Ahmad observed that Radcliff's mood was somewhat depressed but she had an appropriate affect. Tr. 550. Dr. Ahmad observed pain in 18 of 18 tender points. Tr. 507. Dr. Ahmad started Radcliff on amitriptyline. Tr. 550. Tramadol was discontinued because it was not helping with pain and a trial IV of Lidocaine was recommended. Tr. 550. The Lidocaine injection was administered on October 7, 2015. Tr. 545-546.

Radcliff saw Dr. Ahmad for follow up on November 11, 2015. Tr. 593-597. Radcliff rated her pain a 7 on a scale of 0 to 10. Tr. 593. Radcliff felt that the amitriptyline was not helping with her pain or sleep. Tr. 593. Radcliff had also tried Cymbalta, Lyrica, gabapentin, Tramadol, and Norco with limited success or side effects that were not very tolerable. Tr. 593. Dr. Ahmad prescribed a Butrans patch. Tr. 596. The amitriptyline was stopped because Radcliff reported it was not helping her. Tr. 596. Radcliff reported that the Lidocaine IV did not help her

pain and she did not like how it made her feel so she did not want to try a second treatment. Tr. 596. Dr. Ahmad encouraged Radcliff to remain active and exercise as tolerated. Tr. 596.

On November 17, 2015, Radcliff sought treatment with Phoenix Rising Behavioral Healthcare ("Phoenix Rising"). Tr. 631-643. Christina Watson, LPC, conducted the intake evaluation. Tr. 643. Radcliff relayed that her primary care physician had her on Prozac and Xanax but they were not doing enough for her. Tr. 631, 635. Radcliff explained that she got worked up with anxiety and was always worrying about something. Tr. 631. She described having outbursts and going off on people over the smallest things. Tr. 631. Radcliff also explained that she was not sleeping well at night and had restless leg syndrome. Tr. 631. She was not eating a lot but was putting on weight, which Radcliff felt was from stress. Tr. 631. Radcliff was living with her sons and her fiancé. Tr. 631. Radcliff described stressful situations at home, including issues with her oldest son and issues with her fiancé. Tr. 632, 635. Ms. Watson observed that Radcliff was oriented to space and time; she was cooperative and in a stable mood; her speech was clear and her thoughts were logical; hallucinations and delusions were denied; evidence of good hygiene was shown; and Radcliff exhibited good insight into how her symptoms were affecting her daily life. Tr. 636. Ms. Watson diagnosed generalized anxiety disorder, recurrent, and major depressive disorder, recurrent, moderate. Tr. 642. She assessed a GAF score of 45.[2] Tr. 642. Ms. Watson recommended medication management services for Radcliff's anxiety with panic as well as depression. Tr. 642.

---

[2] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

Radcliff saw Lynn Laubach, CNP, of Phoenix Rising on December 30, 2015, for a psychiatric diagnostic evaluation. Tr. 625-630. Radcliff relayed having chronic depression, anxiety, crying spells, and a few panic attacks. Tr. 625. Her stressors included raising her teenage sons and her fiancé's history of drinking. Tr. 625. Radcliff also reported having hypersomnia. Tr. 626. She had been referred to a sleep specialist. Tr. 626. She reported diagnoses of fibromyalgia and osteoarthritis. Tr. 626. Radcliff was diagnosed with generalized anxiety disorder, recurrent, and major depressive disorder, recurrent, moderate and a GAF score of 45 was assigned. Tr. 629. Treatment recommendations included medication management services. Tr. 630. Ms. Laubach prescribed Xanax and anticipated switching Radcliff to a different antidepressant following some genetic testing. Tr. 630. Ms. Laubach referred Radcliff to counseling. Tr. 630.

Radcliff saw Dr. Ahmad for follow up on January 21, 2016. Tr. 588-592. Radcliff described her widespread body pain as mild in intensity. Tr. 588. She rated her pain a 4 on a scale of 0 to 10. Tr. 588. Radcliff was getting some relief from Flexeril and Percocet. Tr. 588. She was requesting to take Percocet more often because of increased pain. Tr. 588. Radcliff was taking Topamax for her headaches. Tr. 588. She noted her headaches had increased due to the colder weather. Tr. 588. Dr. Ahmad continued to note 18 of 18 tender points. Tr. 590. Dr. Ahmad increased Radcliff's Percocet and headache medication. Tr. 591. He reviewed cervical spine and lumbar spine films; encouraged Radcliff to remain active and exercise as tolerated; and recommended that Radcliff start physical therapy for her neck and lower back pain. Tr. 591.

On January 22, 2016, Radcliff saw Adrienne Roth, PCC/LCDC, at Phoenix Rising for an initial counseling session. Tr. 622-624. Radcliff's diagnoses and GAF score were unchanged from prior visits at Phoenix Rising. Tr. 623. Radcliff reported having problems with managing

stress. Tr. 624. She was having crying spells, feeling down, and having anxiety and depression. Tr. 624. She was continuing to have relationship problems with her fiancé. Tr. 624. She had been hopeful that the relationship would have improved since he had stopped drinking but he had replaced his drinking with other hobbies and was not involving himself with the family. Tr. 624. He was planning on moving out because he did not like living with Radcliff's sister. Tr. 624.

On February 2, 2016, Radcliff saw Ms. Laubach for a medication management appointment. Tr. 617-621. Radcliff was taking Prozac but was interested in switching medications. Tr. 617. Radcliff appeared depressed and had a flat affect. Tr. 618. Radcliff's diagnoses were unchanged from her prior visits. Tr. 619, 620. Radcliff's GAF score remained at 45. Tr. 619. Ms. Laubach provided instructions for weaning off of Prozac and started Radcliff on Pristiq. Tr. 620. Radcliff was to continue on Xanax and continue with counseling. Tr. 621.

On February 11, 2016, Radcliff saw Ms. Roth for a counseling session. Tr. 614-616. Radcliff reported no progress and noted an increase in her depression. Tr. 614. Her fiancé had moved in with his brother out of state. Tr. 614. Radcliff was trying to keep herself busy and distracting herself. Tr. 615. Radcliff's children had commented that they felt abandoned. Tr. 615. Radcliff had met with a sleep doctor and she was told to work on changing her sleeping habits. Tr. 615. Radcliff had joined the YMCA and was being more active with her children. Tr. 615. Radcliff listened to music when she felt down. Tr. 615.

On February 17, 2016, Radcliff saw Dr. Ahmad for follow up. Tr. 583-587. Radcliff rated her pain as a 3 on a scale of 0 to 10. Tr. 583. She relayed that an increase in Topamax had helped reduce her headaches but she was still getting them three or four times per week. Tr. 583. Dr. Ahmad's examination revealed 18 out of 18 tender points. Tr. 585. Dr. Ahmad continued Radcliff's medications. Tr. 585. Dr. Ahmad encouraged Radcliff to remain active and exercise

as tolerated and to continue physical therapy for her back and neck.  Tr. 586.  Radcliff reported

some reduction in the pain in her neck and lower back with therapy but her pain was not entirely

resolved and her pain worsened with activity.  Tr. 586.

On March 8, 2016, Radcliff saw Ms. Laubach for medication management.  Tr. 609-613.

Radcliff had weaned off of Prozac and started Pristiq.  Tr. 609.  Radcliff reported feeling less

depressed since starting on Pristiq.  Tr. 609.  Radcliff relayed that her fiancé had moved out and

she had told him he could not return until he quit drinking.  Tr. 609.  Radcliff reported that she

had been attending physical therapy for her back and neck.  Tr. 609.  Radcliff relayed that her

sleep doctor wanted to start her on medication to help her stay awake during the day but her

insurance would not cover it.  Tr. 610.  Radcliff indicated she had been taking her sons to the

YMCA.  Tr. 610.  Radcliff's diagnoses remained unchanged and her GAF score remained at a

45.  Tr. 611.

On March 16, 2016, Radcliff saw Dr. Ahmad for follow up.  Tr. 578-571.  Radcliff

reported that, since her prior visit with Dr. Ahmad, she had fallen three times.  Tr. 578.  Her

ankle was just giving out.  Tr. 578, 581.  She denied dizziness or problems with her vision.  Tr.

578.  Dr. Ahmad noted that Radcliff planned to speak with her physical therapist regarding a

recommendation for an assistive device.  Tr. 581.  Dr. Ahmad continued Radcliff on her

medications and continued to recommend activity and exercise as tolerated and physical therapy

for her neck and back.  Tr. 581.  Since Radcliff was continuing to report neck and back pain that

worsened with activity, Dr. Ahmad noted that an MRI might be considered.  Tr. 581.

Radcliff followed up with Dr. Ahmad on March 25, 2016.  Tr. 573-577.  Radcliff had

completed six weeks of conservative measures, including physical therapy and over-the-counter

anti-inflammatories, and opioid medications with no improvement in her neck and back pain.

Tr. 576.  Thus, Dr. Ahmad ordered an MRI of the cervical and lumbar spine for further evaluation of her pain, looking for stenosis or discogenic etiology for her pain.  Tr. 576.  Due to Radcliff's reports of falling, Dr. Ahmad ordered Radcliff a cane.  Tr. 576.

Radcliff saw Dr. Ahmad for follow up on April 15, 2016.  Tr. 568-572.  Dr. Ahmad reviewed Radcliff's MRI results.  Tr. 571.  Dr. Ahmad observed that Radcliff's lumbar spine MRI showed a diffuse disc bulge at L5-S1 that was contacting the left SI nerve root.  Tr. 568.  Dr. Ahmad recommended a consultation with Dr. Shakir for lumbar injection strategies.  Tr. 571.

Radcliff saw Dr. Ali Shakir, M.D., on May 9, 2016.  Tr. 698-701.  Radcliff described having bilateral lower back pain that radiated down her left leg into her foot.  Tr. 698.  Radcliff indicated she did not want injections.  Tr. 698.  She rated her pain as a 4 out of 10, which she indicated was average.  Tr. 698.

On May 10, 2016, Radcliff saw Ms. Laubach for a medication management appointment.  Tr. 605-608.  Radcliff was stable on her medications and wanted to continue with them.  Tr. 605.  Radcliff discussed issues with her fiancé and her chronic pain.  Tr. 605.  Radcliff indicated that her oldest son was graduating from high school but had not yet made any effort to find a job.  Tr. 605.  Radcliff's diagnoses and GAF score remained unchanged from prior visits.  Tr. 607.  Ms. Laubach continued Radcliff on the same medications.  Tr. 608.  Radcliff also attended counseling with Ms. Roth that same day.  Tr. 602-604, 608.  Radcliff reported no progress and that she was "going crazy."  Tr. 602, 604.  Her fiancé was still living out-of-state but he had relapsed.  Tr. 604.  She reported increased anxiety and depression and she was having worrying thoughts.  Tr. 602.  Radcliff was going to consider attending Al-Anon to be a good support for her fiancé and was going to look into inpatient programs for her fiancé.  Tr. 604.

Radcliff saw Dr. Ahmad for follow up on May 18, 2016. Tr. 692-695. She rated her pain a 6 on a scale of 0 to 10. Tr. 692. Radcliff was continuing to report some relief from Flexeril and Percocet but the Percocet was not keeping her pain under control so she was interested in an increase. Tr. 692. Dr. Ahmad increased Radcliff's Percocet and continued the Topamax. Tr. 695. Dr. Ahmad reviewed Radcliff's cervical and lumbar MRIs. Tr. 695. Radcliff was not interested in injections at that time. Tr. 695.

Radcliff saw Ms. Laubach on June 21, 2016, for a medication management appointment. Tr. 804-808. Radcliff was stable on her medications and wanted to continue with them. Tr. 804. She was sleeping okay. Tr. 804. Radcliff was continuing to communicate with her fiancé who was now living with his mother. Tr. 804. Her oldest son who graduated from high school had found a full-time job; her middle son was working a part-time job; and her youngest son was going to a camp that summer. Tr. 805. Ms. Laubach observed that Radcliff was mildly depressed and she had a full affect. Tr. 805. Radcliff's diagnoses and GAF score remained unchanged from prior visits. Tr. 806.

Later that month, on June 29, 2016, Radcliff met with Ms. Roth for a counseling session. Tr. 801-803. Radcliff had made minimal progress but there was a slight improvement in her mood. Tr. 801. Radcliff's fiancé was planning on moving back to Ohio. Tr. 803. He was going to be getting his own place. Tr. 803. Radcliff reported some conflict with her oldest son. Tr. 803. She was dealing with some medical issues. Tr. 803. Radcliff reported anger outbursts, panic and some crying. Tr. 803. She was swimming at the YMCA to help with coping. Tr. 803.

During an August 3, 2016, counseling session with Ms. Roth, Radcliff again reported minimal progress. Tr. 798. She reported increased anxiety. Tr. 798. Radcliff reported stress

and anxiety due to issues with her fiancé, oldest son, mother and sister. Tr. 800. Ms. Roth and Radcliff discussed working on building healthy relationships. Tr. 800.

Radcliff missed a July appointment with Ms. Laubach. Tr. 793. She saw Ms. Laubach on August 31, 2016. Tr. 793-797. Radcliff was stable. Tr. 793. Radcliff was continuing to struggle with her fiancé's drinking. Tr. 793. She was trying to control his drinking by managing his money. Tr. 793. Radcliff's diagnoses and GAF score remained unchanged from prior visits. Tr. 792. Ms. Laubach continued Radcliff on the same medications. Tr. 796. Radcliff also saw Ms. Roth for counseling on August 31, 2016. Tr. 790-792. Radcliff had made some progress. Tr. 790. She reported reduced panic, no crying spells, and she appeared euthymic. Tr. 790.

Radcliff saw Dr. Ahmad on October 11, 2016. Tr. 809-813. Radcliff reported that her pain level was a 3 on a 0 to 10 scale. Tr. 809. Dr. Ahmad continued to note 18 out of 18 tender points. Tr. 812. Dr. Ahmad continued Radcliff's medications and encouraged her to remain active and exercise as tolerated. Tr. 812.

When Radcliff saw Ms. Laubach on October 12, 2016, Radcliff was stable. Tr. 785. She reported she had not been sleeping well. Tr. 785. Her primary care physician was considering medication to help her stay awake during the day. Tr. 785. Radcliff was continuing to try to work things out with her boyfriend but he was continuing to drink. Tr. 786. Radcliff also saw Ms. Roth for counseling on October 12, 2016. Tr. 782-784. Radcliff reported that things were stressful at home because there were more family members living there. Tr. 782. She also discussed other stressors in her life, including problems with sleep. Tr. 784. Radcliff planned to speak with her primary care physician about her sleep and focus on positives such as her children and finding her own housing. Tr. 784.

Radcliff saw Dr. Ahmad in November and December of 2016 with similar diagnoses and findings being noted.  Tr. 814-818, 819-824.

On November 23, 2016, Radcliff saw Ms. Laubach and Ms. Roth.  Tr. 904-907, 908-910. Ms. Laubach noted that Radcliff had moved back in with her boyfriend with two of their sons because she could no longer take living at her sister's.  Tr. 904.  Ms. Laubach noted that Radcliff had started a new medication to treat narcolepsy.  Tr. 905.  Ms. Laubach made an adjustment to Radcliff's Xanax.  Tr. 905.  Radcliff's diagnoses and GAF score remained unchanged from prior visits. Tr. 906.  Ms. Roth noted that Radcliff had made some progress.  Tr. 908.  Radcliff reported some stress but she was feeling hopeful and having no panic symptoms or crying spells. Tr. 908, 910.  She was looking forward to the upcoming Christmas holiday and was able to afford some gifts for her children that they wanted.  Tr. 910.

During a January 10, 2017, visit with Dr. Ahmad, Radcliff reported some pain relief from her medications but she noted increased pain and headaches over the prior two weeks. Tr. 825. Dr. Ahmad recommended that Radcliff try heat and rest along with her current medications to address her pain flare up.  Tr. 829.

During a March 7, 2017, visit with Dr. Ahmad, Radcliff complained of increased restless leg during the day.  Tr. 837.  Dr. Ahmad continued Radcliff on Percocet and Topamax and added gabapentin to address her complaints of restless leg.  Tr. 841.

On March 27, 2017, Radcliff saw Ms. Laubach for medication management.  Tr. 918-924.  Radcliff was stable on her medications and wanted to continue on them but reported increased stress related to conflict with her boyfriend.  Tr. 918.  Radcliff noted a desire to go back to church.  Tr. 919.  She indicated she would consider Al-Anon.  Tr. 919.  Ms. Laubach noted minimal progress and continued Radcliff on the same medications.  Tr. 923.

When Radcliff saw Dr. Ahmad on April 5, 2017, Radcliff reported her pain as a 4 on a scale of 0 to 10. Tr. 883. She indicated that the gabapentin had helped but the full daytime dose was causing sedation. Tr. 883. Dr. Ahmad continued to note 18 out of 18 trigger points. Tr. 886. Dr. Ahmad continued Radcliff's medications with adjustments being made to the gabapentin. Tr. 887. Dr. Ahmad continued to recommend to Radcliff that she remain active and exercise as tolerated. Tr. 887.

During an April 6, 2017, counseling session with Ms. Roth, it was noted that Radcliff was stressed, depressed and tired but she had increased insight into not being able to change her partner and that staying in the relationship would only increase her distress. Tr. 915. Radcliff's diagnoses of major depressive disorder, recurrent, and generalized anxiety disorder were noted as improved. Tr. 916. Her GAF score remained at 45. Tr. 916. Radcliff was hopeful her oldest son would soon be able to get his own car so that she did not have to continue to transport him. Tr. 917.

### 2.      Opinion evidence

On June 4, 2015, clinical psychologist Natalie A. Meyer, Ph.D., conducted a psychological evaluation. Tr. 496-501. Dr. Meyer summarized her findings and observations, stating:

> Ms. Rebecca Radcliff is a 42-year-old woman seeking disability benefits due to physical health ailments and emotional difficulty. She reported that she has been diagnosed with fibromyalgia and osteoarthritis and experiences chronic pain. Currently, Ms. Radcliff reported feeling sad, depressed, irritable, and easily annoyed. She has low motivation to complete activities of daily living. She is socially withdrawn. She denied periods of mania. She denied suicidal ideation. She has no history of mental health services and is not in counseling. She is prescribed medication to help manage her mood.

Tr. 499. Dr. Meyer diagnosed Radcliff with unspecified depressive disorder, with anxious distress. Tr. 499-500. Dr. Meyer opined that, with appropriate interventions, Radcliff's

prognosis was good. Tr. 500. Dr. Meyer provided the following functional assessment

regarding Radcliff's abilities:

**Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**

The claimant had no difficulty following conversationally and responding to direct questions. She did provide brief answers and would not elaborate, even when prompted. She reported some difficulties with reading comprehension but said she had graduated from high school. She reported difficulties remembering some tasks without reminders but is generally able to care for herself and her home. Due to depressive symptoms, she may have low motivation to complete tasks.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, maintaining persistence and pace, and performing both simple and multi-step tasks.**

The claimant had no difficulty following conversationally. There was no indication of word retrieval difficulty. She did not ask that questions be repeated. Her attention and concentration skills are at least marginally adequate. She recalled six digits forward and four digits backward. She was unable to calculate serial sevens but accurately calculated serial threes. She answered "I don't know" to many items and did not persist when attempting items.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and coworkers in a work setting.**

The claimant was cooperative and interacted appropriately with this examiner. She did appear withdrawn and uncomfortable. She reported being easily irritated with others. She has a limited work history but said she has had difficulties getting along with coworkers in the past. She gets along well with her family members.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

The claimant was cooperative but did appear to be uncomfortable. She has been easily irritated recently. She reported a history of difficulties with others when they "make her mad." Work pressure may increase depressive symptomology including tearfulness, withdrawal from others, slowed work performance, and poor frustration tolerance.

Tr. 500-501.

On July 7, 2015, on initial review, state agency reviewing psychologist Patricia Kirwin, Ph.D., completed a Psychiatric Review Technique (Tr. 136-137) and Mental RFC Assessment (Tr. 140-142). In the PRT, Dr. Kirwin opined that Radcliff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no repeated episodes of decompensation, each of an extended duration. Tr. 136. In the Mental RFC Assessment, Dr. Kirwin opined that Radcliff retained the capacity for one to four step tasks involving simple instructions without demands for fast pace or high production; she could work at a consistent pace in a setting that did not require prioritizing of assigned tasks; because of irritability, a position that did not require persuasion or cooperative problem solving would be best suited for her; and she could adapt to a setting without frequent or unexpected changes in job responsibilities. Tr. 141-142.

On September 18, 2015, upon reconsideration, state agency reviewing psychologist Juliette Savitscus, Ph.D., completed a Psychiatric Review Technique (Tr. 151-152) and Mental RFC Assessment (Tr. 156-158). Dr. Savitscus' PRT findings were similar to Dr. Kirwin's PRT. Tr. 152. Dr. Savitscus' Mental RFC Assessment was similar to Dr. Kirwin's opinion. Tr. 156-158. However, Dr. Savitscus added an additional limitation of occasional superficial contact with others due to evidence showing that Radcliff was uncomfortable during the consultative examination and due to irritability. Tr. 157.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Radcliff testified and was represented at the hearing. Tr. 99-124. Radcliff was using a cane at the hearing. Tr. 101. Ohio Pain and Rehab prescribed the cane about a year prior because Radcliff had been falling. Tr. 101. Radcliff had fallen less than one month prior to the

hearing and estimated falling at least six times during that year. Tr. 101-102. Prior to getting the cane, Radcliff was falling at least once a week. Tr. 102. She did not know what exactly caused her to fall but explained she will get off balance and, sometimes, when she is walking up steps, her toes will hit the steps and she goes forward. Tr. 121. Radcliff normally uses her cane only when outside her home but she has been advised to start using it while she is at home as well. Tr. 122.

The ALJ asked Radcliff to explain in her own words why she is unable to work. Tr. 105. Radcliff indicated that, if she stands for long periods of time, it hurts her back; her hands go numb which prevents her from lifting anything; and her feet are numb 90% of the time. Tr. 106. Radcliff was receiving treatment for her upper and lower back, neck and fibromyalgia at Ohio Pain and Rehab. Tr. 106. Ohio Pain and Rehab was also prescribing some of Radcliff's migraine medication. Tr. 106. Radcliff has not had surgery on her lower back. Tr. 106. Injections have been recommended for Radcliff's lower back but she did not get the injections – she stated, "the thought of needles going in my back, no." Tr. 106-107. Radcliff received physical therapy for her lower back problems and she was taking Percocet. Tr. 106-107. If the Percocet did not work, Radcliff was advised that she would have to return for therapy. Tr. 107. Radcliff indicated that therapy helped her learn to deal with her pain a little bit. Tr. 107. After completing therapy, Radcliff was not advised to continue with exercises at home. Tr. 107. She did have some stretches that she could do to help with the pain when it got really bad. Tr. 107. She has not used a TENS unit. Tr. 107. Radcliff has found that heat helps her back some but ice does not help. Tr. 107. She also uses Lidocaine patches on her back to help with the pain. Tr. 107-108.

On a scale of one to ten, Radcliff rated her pain about a four at the hearing. Tr. 108. She rated her neck and upper back pain about a one. Tr. 108. Radcliff indicated she had some problems with her right knee and she rated that pain about a two during the hearing. Tr. 108. Radcliff received a cortisone injection in her knee,[3] which helped with the pain for about three months. Tr. 109-110. Radcliff has pain in her feet which she described as numbness and tingling. Tr. 108. At the hearing, she rated her foot pain about a four. Tr. 108. Radcliff explained that her pain levels could be worse than what she was feeling at the time of the hearing, noting her pain is especially bad in the mornings and before she has taken her medications. Tr. 108-109. She indicated that the pain in her lower back and feet is usually worse than the pain in her knee and neck. Tr. 109. Radcliff explained that she also has numbness and tingling in her hands as well. Tr. 109. She indicated that her hands were worse than her feet and estimated her pain level in her hands at that time to be about a six. Tr. 109. Her hand pain is so bad at times that she is unable to open jars or bottles and she drops things all the time. Tr. 109. Also, buttoning buttons on a shirt would be difficult for her early in the morning. Tr. 119-120. As recently as the morning of the hearing, Radcliff had dropped a bottle. Tr. 109. Radcliff has braces for her hands that she wears at night. Tr. 110. Radcliff has swelling in her legs for which she takes water pills. Tr. 130. She also has gastrointestinal problems. Tr. 120-121.

Radcliff is able to keep track of taking her medications. Tr. 111. She uses a pill container that she prepares each week. Tr. 111. As long as she writes downs appointments, she does not have a problem remembering them but she does have problems with her long-term memory. Tr. 111. Radcliff has a hard time concentrating. Tr. 113. She explained she can be

---

[3] The injection was administered in April 2015. Tr. 122.

having a conversation with someone and she will have to ask the individual to repeat what they said. Tr. 113-114. She falls asleep when reading a book. Tr. 114. She is unable to watch a movie without falling asleep or getting up and down. Tr. 114. Radcliff explained that she experiences anger outbursts one to three times each week. Tr. 114. She recently had an outburst towards her oldest son who had come over to visit. Tr. 114. She really could not say what caused the outburst. Tr. 114. She had jumped at him about his dog and they ended up in a big argument. Tr. 114. Radcliff has also had outbursts with non-family members. Tr. 117. For example, she has gotten into it with cashiers. Tr. 117. Radcliff gets nervous and agitated when things are not as she thinks they should be. Tr. 114-115. When Radcliff was working, she had disagreements with supervisors and customers. Tr. 116. She does not recall being fired from a job due to an anger outburst. Tr. 116.

Radcliff has received treatment for her bipolar disorder, depression and anxiety at Phoenix Rising. Tr. 115. She takes various medications, including Pristiq, Buspar, and Xanax. Tr. 115. Radcliff sees her treating provider every six weeks and she also sees a counselor every six weeks. Tr. 115. Radcliff does not hear or see things and she has not had suicidal or homicidal thoughts (even during an anger outburst). Tr. 116.

Radcliff explained that she has a sleep disorder that makes her want to sleep all the time. Tr. 118. If she had the option to do so, she could sleep all day and night. Tr. 118. Radcliff has been treated for apnea and narcolepsy and those conditions have been ruled out. Tr. 118-119. She falls asleep while out in public. Tr. 119. For example, she explained she had fallen asleep in her doctor's office the day before the hearing. Tr. 119. She ended up waking herself up because she dropped her cell phone but she did not know how long she had been asleep. Tr. 119. Radcliff indicated that it happens all the time – a couple times a week, if not more. Tr. 119.

Radcliff described a typical day – she wakes up around 5:30 a.m. to try to get moving; she wakes her boys up for school around 6:00 a.m.; her boys are off to school around 6:45 a.m.; she tries to stay awake after they leave for school but a lot of times she is unable to stay awake; about two to five days out of the week, Radcliff ends up staying in her pajamas because she does not feel like getting dressed due to pain and not having the strength to do anything; if she has a doctor appointment to go to, she usually makes sure she has someone to go with her.  Tr. 111-112, 117-118.  Radcliff drives but only short distances and she always tries to have someone with her for conversation to keep her awake.  Tr. 100.  More than once a month, Radcliff will go without showering or changing her clothes for three or four days.  Tr. 118.

Radcliff's sons usually eat breakfast at school.  Tr. 112.  As far as household chores, Radcliff runs the vacuum once or twice each week.  Tr. 112.  With breaks, she can usually prepare meals.  Tr. 112.  Her sons help her with most of the housecleaning and they help her with the laundry.  Tr. 112.  Radcliff's mother also comes over and helps her with cleaning.  Tr. 113. Radcliff sees her mother about three or four times each week.  Tr. 112-113.  Other than attending doctor appointments, grocery shopping, and visiting at her mother's house about once a week, Radcliff really does not leave her house.  Tr. 112-113.  There are two people in Radcliff's apartment complex whom Radcliff talks with.  Tr. 113.  Radcliff and her sister do not live very far apart but they do not really see each other or talk.  Tr. 113.  Radcliff's sons are in the marching band at school.  Tr. 113.  She has not been to one of the football games to watch them perform.  Tr. 113.  She noted that the games are usually during cold weather.  Tr. 113.

## 2. Vocational expert's testimony

Vocational Expert Gene Burkhammer ("VE") testified at the hearing. Tr. 124-129. The VE described Radcliff's past work to include work as (1) a childcare provider, a light SVP 4 job; and (2) a convenience store cashier, a light SVP 2 job.[4] Tr. 124.

For his first hypothetical, the ALJ asked the VE to assume an individual of Radcliff's age and with her education and work history who would be limited to light work with the following additional limitations: pushing and pulling as well as operation of foot controls with the bilateral lower extremities would be limited to frequently; pushing and pulling as well as operation of hand controls with the bilateral upper extremities would be limited to frequently; handling and fingering would be limited to frequently; could never climb ladders or scaffolds; could occasionally climb ramps and stairs; could occasionally balance, stoop, kneel, crouch and crawl; would need to avoid concentrated exposure to moderate, loud and very loud noise as well as vibrations; could perform simple, routine, and repetitive tasks but not at a production rate pace; could respond appropriately to occasional change in routine work setting as long as any such changes were gradually introduced and easily explained and/or demonstrated; and could interact frequently with supervisors, but only on an occasional superficial basis with co-workers and the general public. Tr. 124-125. The ALJ defined superficial to mean no sales, arbitration, negotiation, conflict resolution, group tasks or management or direction of others. Tr. 125. The VE indicated that the first described individual would be unable to perform Radcliff's past work. Tr. 125. However, the VE indicated that there would be other work in the national economy that

---

[4] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

the described individual could perform, including (1) housekeeping cleaner; (2) officer helper; and (3) mail clerk.  Tr. 125-126.  The VE provided national job incidence data for each of the identified jobs.  Tr. 126.

The ALJ then asked the VE to consider the individual described in the first hypothetical but instead of being limited to light exertional work the individual would be limited to sedentary work.  Tr. 126.   The VE indicated that there would be sedentary jobs available, including (1) document specialist; and (2) and food and beverage order clerk.  Tr. 126-127.  The VE provided national job incidence data for each of the identified jobs.  Tr. 126-127.

In response to further questioning by the ALJ, the VE indicated that an acceptable level of off-task behavior is up to 15% and an acceptable level of absenteeism is up to two days per month.  Tr. 127.

The ALJ then asked the VE to consider a third hypothetical, i.e., the second sedentary hypothetical but with an at will sit/stand option with the understanding that, even with the changing or shifting of positions, the individual would be off task less than 15% of the workday.  Tr. 127.  The VE indicated that the jobs identified in response to the second hypothetical would be available to the individual described in the third hypothetical.  Tr. 127.

Radcliff's counsel then asked the VE to consider the first hypothetical with just one change – the frequent handling and fingering would be changed to occasional.  Tr. 128.  With that change, the VE indicated that there would be no jobs available.  Tr. 128.  Also, with that change to the second hypothetical, the VE indicated that there would be no jobs available.  Tr. 128.

## III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d

119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof

at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy. *Id.*

## IV. The ALJ's Decision

In his June 21, 2017, decision, the ALJ made the following findings:[6]

1.  Radcliff meets the insured status requirements of the Social Security Act through December 31, 2019. Tr. 43.

2.  Radcliff has not engaged in substantial gainful activity since May 1, 2014, the alleged onset date. Tr. 43.

3.  Radcliff has the following severe impairments: obesity, intervertebral degenerative disc disease of lumbar spine, cervical disc disease, osteoarthritis of right knee, fibromyalgia/fibromyositis, migraine, carpal tunnel syndrome, edema lower extremities, reactive gastropathy/reflux esophagitis/gastroesophageal reflux disease/gastroparesis/irritable bowel syndrome/mild antral gastritis, hypersomnia, major depressive disorder/bipolar disorder, and generalized anxiety disorder.[7] Tr. 43-44.

4.  Radcliff does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments. Tr. 44-47.

5.  Radcliff has the RFC to perform light work except she can frequently push and pull as well as the operation of foot controls with bilateral lower

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[6] The ALJ's findings are summarized.

[7] The ALJ found other impairments to be non-severe. Tr. 43-44.

extremities; can frequently push and pull as well as the operation of hand controls, handle and finger with the bilateral upper extremities; can never climb ladders or scaffolds but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; should avoid concentrated exposure to moderate loud and very loud noise; should avoid concentrated exposure to vibration; can perform simple routine and repetitive tasks but not at a production rate pace; can respond appropriately to occasional changes in the routine work setting as long as any such changes are gradually introduced and easily explained and/or demonstrated; can frequently interact with supervisors but only on an occasional and superficial basis with coworkers and the general-public (superficial defined as no sales, arbitration, negotiation, conflict resolution, group tasks, or management or direction of others).  Tr. 47-56.

6.   Radcliff is unable to perform past relevant work.  Tr. 56-57.

7.   Radcliff was born in 1972 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 57.

8.   Radcliff has at least a high school education and is able to communicate in English.  Tr. 57.

9.   Transferability of job skills is not material to the determination of disability.  Tr. 57.

10.  Considering Radcliff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Radcliff can perform, including cleaner, housekeeper; office helper; and mail clerk.  Tr. 57-58.

Based on the foregoing, the ALJ determined that Radcliff had not been under a disability, as defined in the Social Security Act, from May 1, 2014, through the date of the decision.  Tr. 58.

## V. Plaintiff's Arguments

Radcliff challenges the ALJ's RFC assessment, arguing that the ALJ erred in evaluating her mental impairments and fibromyalgia.  Doc. 14, pp. 1, 10-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.**    **The ALJ did not err in his consideration of the evidence pertaining to Radcliff's mental health impairment and Radcliff has not shown that the mental RFC limitations are not supported by substantial evidence**

Radcliff argues that the ALJ's mental RFC is not supported by substantial evidence because the ALJ assigned considerable weight to the opinion of consultative examining psychologist Dr. Meyer but adopted RFC restrictions that were not consistent with Dr. Meyer's opinion.  Also, Radcliff contends the mental RFC is not supported by substantial evidence

because the ALJ did not acknowledge all of the GAF scores, which remained at 45 from 2015 through 2017.

The Court finds that Radcliff's claim that reversal and remand is warranted based on the ALJ's weighing and consideration of the opinion of consultative examining psychologist Dr. Meyer is without merit. The essence of Radcliff's claim is that the ALJ assigned considerable weight to Dr. Meyer's opinion but formulated an RFC with restrictions that were not consistent with that opinion. After discussing the content of Dr. Meyer's opinion, the ALJ explained the weight assigned to her opinion, stating

> I give considerable weight to the opinion from the consultative assessment since the evidence of record mostly support these conclusions, and these limitations were taken into account in crafting the above residual functional capacity limiting claimant to unskilled, low stress work in a relatively static environment with limited social interaction.

Tr. 54.

As Radcliff notes, the ALJ found Radcliff capable of work provided that the work was unskilled and low-stress. Doc. 14, p. 13. More particularly, the ALJ included the following limitations in the RFC to account for Radcliff's mental health impairments:

> can perform simple routine and repetitive tasks but not at a production rate pace; can respond appropriately to occasional changes in the routine work setting as long as any such changes are gradually introduced and easily explained and/or demonstrated; can frequently interact with supervisors but only on an occasional and superficial basis with coworkers and the general-public (superficial defined as no sales, arbitration, negotiation, conflict resolution, group tasks, or management or direction of others).

Tr. 47-48.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence in your case record." 20 C.F.R. §§ § 404.1545(a)(3), 404.1546(c). The ALJ, not a physician, is

responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1545 (c); *Poe*, 342 Fed. Appx. at 157. In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* Thus, contrary to Radcliff's contention, while the ALJ assigned considerable weight to Dr. Meyer's opinion, the ALJ was not required to incorporate the entirety of Dr. Meyer's opinion into the RFC assessment.

Furthermore, Radcliff has not shown that the RFC limitations that the ALJ included in the RFC do not adequately account for Dr. Meyer's opinion. Dr. Meyer opined that "[d]ue to depressive symptoms, [Radcliff] may have low motivation to complete tasks" and "[w]ork pressure may increase depressive symptomology including tearfulness, withdrawal from others, slowed work performance, and poor frustration tolerance." Tr. 500, 501 (emphasis supplied). Radcliff contends that, because Dr. Meyer did not specify the stress level of "work pressure," "any degree of work pressure would cause Plaintiff's deterioration in functioning." Doc. 14, p. 13. Radcliff's argument is flawed. Dr. Meyer did not indicate that work pressure would cause deterioration in functioning. Rather, she opined that work pressure may increase depressive symptomology. Tr. 501. Further, to the extent that Radcliff contends that Dr. Meyer's opinion amounts to an opinion that Radcliff is unable to perform any work, that issue is reserved to the Commissioner. As the ALJ indicated, he took Dr. Meyer's limitations into account when formulating the RFC, which limited Radcliff to unskilled, low stress work in a relatively static environment with limited social interaction.

Based on the foregoing, the Court finds that Radcliff has not demonstrated error with respect to the ALJ's consideration of Dr. Meyer's opinion nor has she demonstrated that the ALJ failed to adequately account for limitations contained in Dr. Meyer's opinion when formulating Radcliff's RFC. Accordingly, the Court finds no error with respect to the ALJ's consideration of Dr. Meyer's opinion.[8]

The Court also finds that Radcliff's claim that reversal and remand is warranted because the ALJ did not acknowledge each and every GAF score of 45 and provided only "little weight" to the November 17, 2015, GAF score of 45 is without merit. As summarized by another court in this District, the Sixth Circuit has taken a case-by-case approach regarding the value of GAF scores and has indicated that, while ". . . a GAF score may be of considerable help to the ALJ in formulating the RFC[,]" a "GAF score is not essential to the RFC's accuracy[.]" *See Walsh v. Colvin*, 2016 WL 1752854, * 15-16 (N.D. Ohio May 3, 2016) (internal citations and quotations omitted). Also, an ALJ is "not . . . required to place any particular amount of weight on a GAF score . . . [and] the failure to reference a GAF score is not, standing along, sufficient ground to reverse a disability determination." *Id.* at * 16 (internal citations and quotations omitted).

As Radcliff recognizes, the ALJ specifically noted the November 17, 2015, GAF score, which was assigned during Radcliff's mental health assessment at Phoenix Rising, and he explained why little weight was assigned to that score, i.e., because the "record did not show that [Radcliff's] anxiety and depression were significantly limiting her daily functioning." Tr. 54. While the ALJ did not specifically state that subsequent mental health treatment records consistently reflected a GAF score of 45, the ALJ discussed in detail Radcliff's subsequent mental health treatment records, which included reported activities that the ALJ found were not

---

[8] The ALJ also considered and relied upon the opinions of the state agency reviewing psychologists when formulating Radcliff's RFC. Tr. 56. Radcliff does not challenge the ALJ's reliance on those opinions.

indicative of Radcliff's daily functioning being significantly limited, e.g., signed up for YMCA and was being more active with her children, going to the YMCA for swimming, looking forward to the upcoming holiday, driving son to work.  Tr. 54-56, 615, 803, 910, 917.  Thus, it cannot be said that the ALJ ignored the evidence.  Furthermore, Radcliff has not shown that the ALJ's reason for discounting the GAF score is not supported by substantial evidence.  Rather, she argues only in a cursory manner that the weight assigned was not supported by substantial evidence.  Doc. 14, p. 13.  Moreover, "GAF scores are not raw medical data and the Commissioner has declined to endorse the GAF score for use in Social Security benefits program."  *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836-837 (6th Cir. 2016) (internal citations and quotations omitted).

Considering the foregoing, the Court rejects Radcliff's claim that reversal and remand is required based on the ALJ's consideration of the GAF score evidence.

**B.     The ALJ did not err in evaluating Radcliff's fibromyalgia**

Radcliff contends that the ALJ did not properly evaluate her fibromyalgia.  In making her argument, Radcliff points out that an undue influence on objective evidence when discounting a medical opinion setting forth limitations due to fibromyalgia may be a basis for reversal.  Doc. 14, pp. 14015.  However, Radcliff does not rely upon or point to any medical opinion setting forth limitations stemming from her fibromyalgia.  Nor has she demonstrated that the ALJ placed undue influence on a lack of objective findings.

Rather, Radcliff argues that her fibromyalgia explains her subjective allegations of disability and her allegations are consistent with her record of specialized treatment for fibromyalgia.  She then proceeds to describe treatment records which include a diagnosis of fibromyalgia, physical examination findings showing tenderness in all 18 fibromyalgia tender

points, medication adjustments, recommendations for physical therapy and injections, and prescriptions for pain patches and a cane for ambulation.  Doc. 14, pp. 15-16.  However, a diagnosis of fibromyalgia does not in itself entitle a claimant to disability.  *See Stankoski v. Astrue*, 532 Fed. Appx. 614, 619 (6th Cir. 2013) (citing *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. 2008)).

Additionally, the ALJ considered Radcliff's subjective allegations and discussed Radcliff's medical treatment relative to her physical impairments in detail, including evidence regarding her fibromyalgia and found fibromyalgia to be a severe impairment.  Tr. 43, 48-53.  In evaluating Radcliff's subjective allegations, the ALJ considered the record as a whole.  For example, he considered evidence showing that Radcliff was engaging in a variety of activities that were inconsistent with being disabled.  Tr. 48-49, 52-53.  The ALJ considered evidence that Radcliff declined her physician's recommendation that she undergo lumbar injections to help with her pain.  Tr. 51.  Radcliff has failed to demonstrate that the ALJ's assessment of her credibility was contrary to Social Security Ruling 12-2p, 2012 WL 3104869 (July 25, 2012), which addresses the manner in which fibromyalgia is to be evaluated.

Considering the foregoing, the Court finds that Radcliff has not demonstrated that the ALJ erred in his evaluation of her fibromyalgia or in his assessment of the credibility of her subjective allegations.  Further, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  The ALJ concluded that fibromyalgia was among Radcliff's severe impairments (Tr. 43), proceeded with the sequential evaluation steps, and assessed an RFC that limited Radcliff to light work with additional physical and mental limitations (Tr. 47-48).  While

Radcliff disagrees with the ALJ's assessment of her RFC, she has not demonstrated that the RFC is unsupported by substantial evidence nor does she identify specifically what evidence supports greater RFC limitations stemming from her fibromyalgia than those found by the ALJ.

### VII. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

March 11, 2019

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge